THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MICHAEL B. McCARTY as Chapter 7 Bankruptcy Trustee of the bankruptcy estate of Northern Orion, Inc., a Washington corporation; PG ALASKAN CRAB INVESTMENT CO. LLC, a Delaware limited liability Company,<br><br>Plaintiffs,<br><br>v.<br><br>NOAA FISHERIES SERVICE, et al.,<br><br>Defendants. | CASE NO. C11-1393<br><br>ORDER |

This matter comes before the Court on Plaintiffs' amended motion for summary judgment (Dkt. No. 17), Defendants' response and cross-motion (Dkt. No. 18), Plaintiffs' combined response and reply (Dkt. No. 20), and Defendants' reply. (Dkt. No. 22.) Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS Defendants' motion for the reasons explained herein.

I.      BACKGROUND

This case involves a crab-fishing quota given in error. The rights to fish various species of crab in the Bering Sea and Aleutian Islands are governed by a shifting and often complicated scheme of permits and regulations promulgated by the National Marine Fisheries Service ("NMFS") under the Magnuson-Stevens Fishery Conservation and Management Act ("the Act").

ORDER
PAGE - 1

In 2000, fishing rights were allocated through License Limitation Program permits ("LLPs"). (Dkt. No. 11 at ¶ 30.) LLPs were based on fishing history between January 1, 1988 and June 27, 1992.[1] 63 Fed. Reg. 52,643. In general, the more that a vessel had harvested in the past, the more it would be allotted in the future. To prevent the issuance of permits to dormant vessels, these regulations were amended to require demonstration of a single documented harvest from a qualifying vessel during the Recent Participation Period, between January 1, 1996 and February 7, 1998. 66 Fed. Reg 48,814. The regulations included an exception to the recent participation requirement for vessels that were lost or destroyed, but only if the lost or destroyed vessel were merged with a vessel that had made a documented harvest during the recent participation period. *Id.* Under these rules, the NMFS issued Northern Orion, Inc. two LLP permits, one based on the fishing history of the vessel F/V NORTHERN ORION (and its own recent participation period harvests) and one based on the fishing history of the vessel F/V ST. MATTHEW, which sank in 1994 (merging it with the recent participation period of the F/V NORTHERN ORION).

The situation was complicated further by the implementation of the "Crab Buyback Program" in December 2000. The program authorized NMFS to pay vessel owners in exchange for surrendering their LLP permits and permanently revoking all fishery licenses, permits, catch histories, and other privileges issued to the vessel. 18 U.S.C. § 1861a(b)(2). In 2004, Northern Orion, Inc. submitted a bid to sell back the fishing history and LLP license for F/V NORTHERN ORION for $5,150,000. (Dkt. No. 15-0007 at 7.) NMFS accepted the bid and, on instruction from Northern Orion, wired the funds to PG Alaska, a creditor of Northern Orion, as partial payment for a debt.

Then NMFS made an error. After payment to PG Alaska, F/V NORTHERN ORION's fishing history was supposed to be permanently revoked *including* that vessel's history that had been merged with the LLP license associated with the F/V ST. MATTHEW. This history was

---

[1] There are a few cases in which this period is extended to 1994, but they are immaterial in this action.

ORDER
PAGE - 2

not to be used in calculating any future quota share. But NMFS failed to remove the fishing history of the F/V NORTHERN ORION from the LLP license associated with the F/V ST. MATTHEW. (*Id.* at 13–14.)

When NMFS implemented a new regulatory program in 2005, the Bering Sea and Aleutian Island Crab Rationalization Program, this error had real consequences. The purpose of the new program was to replace the old LLP system with a quota share system. A quota share reflects a fishery participant's percentage share of a fishery, based on past records, rather than a specific amount of crab. NMFS then calculated each participant's annual individual fishing quota by applying the quota share percentage to the actual volume of crab that the State of Alaska determines can be sustainably harvested that year. 50 C.F.R. § 680.40. As a result of NMFS's earlier error, Northern Orion was issued a quota share that was based largely on the relinquished fishing history of F/V NORTHERN ORION. This quota share had an estimated market share of $5 million, and allowed Northern Orion to receive annual individual fishing quotas worth approximately $500,000. (*Id.* at 11–14.)

Northern Orion filed for bankruptcy in 2006. Northern Orion's bankruptcy estate received individual fishing quota permits in four successive crab fishing years, from 2007–2011, and PG Alaska was assigned payments of $500,000 for three of those years. (*Id.* at 10, 36.) On two occasions in February 2008, PG Alaska requested and received from NMFS confirmation about the crab quota share then held by Northern Orion. (*Id.* at 10.) Acting on this information, PG Alaska surrendered collateral to the bankruptcy estate, including $350,000 in cash, forgave debt of more than $5 million, and received 100% of Northern Orion's stock and Northern Orion's erroneously issued quota share. (*Id.* at 11.)

In June 2009, NMFS was informed of the erroneous issuance of quota share to Northern Orion. (*Id.* at 11.) On June 23, 2009, NMFS issued an initial administrative decision revoking the quota share. (*Id.* at 12.) Northern Orion's bankruptcy trustee appealed the decision and on August 1, 2011, Administrative Judge Mary Alice McKeen found that the agency had inherent

authority to revoke the quota share, was not estopped from doing so, and affirmed the revocation. On August 18, 2011, the Administrator for NMFS Alaska Region affirmed Judge McKeen's decision in a final agency action. Plaintiffs now challenge that action.

## II.   APPLICABLE LAW

Under the APA, a court may set aside an agency decision only if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is valid if the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made. *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010). An agency's interpretation of its own regulations is controlling unless "plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997). Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

## III.   DISCUSSION

### A.   Estoppel

Plaintiffs' first argument is that the government is estopped from revoking the quota share. An estoppel plaintiff must show: (1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury. *Watkins v. United States Army*, 875 F.2d 699, 709 (9th Cir. 1989). A plaintiff seeking estoppel against the government must also show "affirmative misconduct going beyond mere negligence;" even then, "estoppel will only apply where the government's wrongful act will cause a serious injustice, and the public's interest will not suffer undue damage by imposition of the liability." *Id.* In general, courts look for "extreme circumstances" to support estoppel against the government. *Office of Pers. Management v.*

*Richmond*, 496 U.S. 414, 434 (1990).

There is no test to determine whether agency action affirmative misconduct or mere negligence, but *Watkins v. United States Army* provides a useful illustration. 857 F.2d 699 (9th Cir. 1989). That case concerned Sgt. Watkins, a gay soldier who was denied reenlistment because of his sexual orientation. Watkins had indicated homosexual tendencies on an army medical form; signed an affidavit for the Army stating that he had been a homosexual since the age of 13 and that, since his enlistment, he had engaged in sodomy with two other servicemen, a crime under military law; been twice deprived of security clearances after investigation of his homosexuality; been the subject of an official board of inquiry into his homosexual tendencies and their effects on unit morale; and stated to the Army that he was homosexual in a personnel interview. *Id.* at 702–05. During this entire period, it was widely understood that homosexuality was a nonwaivable disqualification for reenlistment. And yet, the Army allowed him to enlist and reenlist several times; dropped an investigation into charges of sodomy; granted him security clearances; and found him suitable for retention in the military service. *Id.* After fourteen years of military service, the Army sought to discharge Watkins or reject his reenlistment. The court found "ongoing affirmative misrepresentations" and held that the Army was estopped from barring his reenlistment.

The Court is wholly unconvinced that the present case resembles *Watkins* in any manner. In that case, there was ample evidence that the Army knew that Watkins' service violated Army rules but made statements to encourage that service. Here, everything about the erroneous issuance of the quota share appears to be due to a single, simple error. Plaintiffs have made no showing that anyone within the NMFS had any knowledge that Northern Orion's quota share was in violation of the rules. There is no evidence of a "deliberate lie or a pattern of false promises that would satisfy the requirement of affirmative misconduct." *See Socop-Gonzalez v. INS*, 208 F.3d 838, 843 (9th Cir. Cal. 2000) (citation omitted); *see also Pauly v. United States Dep't of Agric.*, 348 F.3d 1143, 1149 (9th Cir. Wash. 2003) (Plaintiffs "offer no evidence that the

alleged misrepresentation was deliberate or fraudulent.") Plaintiffs claim that the actions of NMFS actions constitute "misconduct at the very core of the agency's function," "fundamental disregard of . . . central obligations," "wholesale failure," "core programmatic failure," and "substantial violations of key laws and rules." (Dkt. No.17 at 12; Dkt. No. 20 at 3, 4, 18.) But this is empty hyperbole and nothing more.

### B. Agency Authority

Plaintiffs' next argument is that NMFS lacked statutory authority to revoke the quota share under the Magnuson-Stevens Act. The Act states that quota shares and other fishing rights "may be revoked, limited, or modified at any time in accordance with this chapter." 18 U.S.C. § 1853a(b)(3). Plaintiff argues that because of the "in accordance with this chapter" language, NMFS can only revoke a quota share if the Magnuson-Stevens Act explicitly provides for the revocation of quota shares issued in error. (Dkt. No. 17 at 22.) The Court disagrees. Not only does the Act make it clear that quota shares are revocable, but also the parties agree that the quota share was issued in violation of the Act. The Court reads the "in accordance with" language to mean that quota shares may be revoked in a manner that is not inconsistent with the Act. *Auer*, 519 U.S. at 461. There is no apparent intention in the Act to limit revocations to specifically enumerated circumstances. Accordingly, NMFS has express statutory authority to revoke quota shares and permits that have been issued in error.

## IV. CONCLUSION

Plaintiffs' motion for summary judgment is DENIED (Dkt. No. 17) and Defendants' motion for summary judgment is GRANTED.  (Dkt. No. 18.) This case is DISMISSED.

DATED this 30th day of September 2011.

*/s/ John C. Coughenour*

John C. Coughenour
UNITED STATES DISTRICT JUDGE